LITTLE v. HOLT.

5-1637

318 S. W. 2d 157

Opinion delivered November 10, 1958.

[Rehearing denied December 22, 1958]

Rex W. Perkins & David J. Burleson, for appellant.

Hubert L. Burch & John Wm. Murphy, W. B. Putman, for appellee.

CARLETON HARRIS, Chief Justice. This appeal presents the question of sufficiency of the evidence to warrant cancellation of a deed for failure of consideration, the consideration therefor being an agreement by appellees Holt to support and care for appellant Little for

the remainder of his life. On January 15, 1952, T. E. Little, then 68 years of age, the owner in fee simple of a 107 acre farm in Washington County, executed and delivered to James and Arlene Holt, husband and wife, a warranty deed conveying said property to the Holts in consideration of their oral agreement to support and care for him for the balance of his life. Mrs. Holt is Mr. Little's great-niece. Appellant lived with appellees on the said farm[1] from shortly after that date until March 11, 1957, at which time he commenced living at the Haws boarding home, near Fayetteville, where he has remained since that time.

On April 1, 1957, Mr. Little filed a complaint in the Washington Chancery Court, setting out the conveyance and agreement with the Holts, alleging that appellees had breached the agreement to support and care for him, and praying that the conveyance be cancelled and held for naught, and that the title to said property be decreed to be in him.

In the meantime, on March 12, 1957, the Holts had conveyed the property (87 acres, including improvements) to J. M. Summers and wife,[2] which deed[3] was allegedly also executed by T. E. Little.[4]

The Holts answered with a general denial, further pleading laches and estoppel, and the Summers answered that they had received a deed from the Holts and Little; that they were *bona fide* purchasers for value without notice, and that Little was estopped to question the authenticity of either the deed executed and delivered by him to the Holts, or the one executed by him and the Holts to them. They further filed a cross-complaint against the Holts, stating that they had paid

---

[1] He lived with the Holts from eight months to a year in their home at Lincoln before deeding his own property to them.

[2] 20 acres had several years earlier been conveyed to W. C. Little.

[3] This conveyance was not filed for record until about an hour and a half after appellant's suit was filed, but that fact is not material to determination of this cause.

[4] On April 4, Little amended his complaint, setting out that he did not sign the deed to the Summers, that if his signature appeared, it had been obtained by trickery and fraud, and asked that the deed to Summers also be cancelled, set aside, and held for naught.

the latter $6,500 for the property, and asking alternative relief against them in said amount, should the conveyance be set aside, and praying a lien on the property. On trial of the issues, the court found for appellees Holt as against Little, and further dismissed the cross-complaint filed by the Summers against the Holts. From such decree dismissing his complaint, appellant brings this appeal.

Before entering into a discussion of appellant's contention of a breach of contract by the Holts, we will consider the validity of the deed received by the Summers. This deed was admittedly signed by the Holts and allegedly signed by Little. Mr. Holt testified that he took the deed to Little at the Haws home, and the old man signed it. Goldie Jones, an employee of the University, was to take the acknowledgment, but was unable to go at that particular time. Approximately a week later she went to the home, along with Holt, his brother, and Mr. Summers and his son, to see Mr. Little for the purpose of taking the acknowledgment. From her testimony:

"At first he was confused, he didn't know whether he had signed it or not, and the more he talked, he decided he didn't sign it; however, I got his signature for my own personal benefit.[5]

\* \* \*

Well, I asked him if he would acknowledge his signature, and he looked at it awhile; well, he didn't know whether it was or not, and then, he was a little confused and talked around there, and then he decided he didn't. There was a lot of conversation."

She further stated that Mr. Little told Mr. Summers that he had no objection to Holt selling the farm. From the testimony and a comparison of Mr. Little's signature (taken from exhibits), with the signature on the Summers' deed, the court found that Mr. Little had executed the instrument. We are unable to say that this conclusion was incorrect. From cross-examination of

---

[5] On an old envelope.

the Holts, appellant's counsel indicated that they attached some importance to the fact that Mr. Little's signature was even obtained, *i. e.*, if he had no interest in the property or if the contract had been observed by the Holts, why obtain a useless signature? We attach no significance to this fact. Under the agreement by which the Holts received the deed from Little, it would seem a proper precautionary step to take; however, the evidence reveals that this was done because of the requirement of an attorney examining the abstract, and acting on behalf of the purchasers. We consider that the Summers were innocent or *bona fide* purchasers for value.

We now turn to appellant's contention that the court erred in holding that the evidence, offered in behalf of his allegations, was insufficient to establish a breach of the agreement by the Holts. In addition to the parties, eleven witnesses testified for appellant, and eight for appellees, though the testimony of one of appellant's witnesses was probably more favorable to appellees than to appellant. Several of these witnesses were distantly related to appellant and Mrs. Holt. Appellant's nearest relatives were nephews, but in the early part of 1951, Little, who had lived alone for several years, commenced living with the Holts. He lived in their home for eight months to a year before entering into the agreement, which is the subject of this lawsuit. Following the agreement, and execution of the deed, the parties moved to the Little home. There, extensive repairs, according to Mrs. Holt's testimony, in the amount of approximately $3,000, were made on the premises by the Holts. In the fall of 1955, Mr. Little moved to a granary back of the house to live. Appellant says that these appellees forced him to move to this building, while the testimony on their part is that he asked to move out to himself, because the operation of a TV set, and the children's noise disturbed him. A bed, stove, and chairs were placed in the granary, and repairs were made on the building for the purpose of making it more livable. The evidence disclosed, however, that wide cracks were left in some places, and the building was cold in the

wintertime. In addition to being moved from the house, the evidence of mistreatment upon which appellant relies for a concellation of the contract, is briefly as follows. Mr. Little testified that the children mistreated him and would hit him; that Mr. Holt knocked him down on one occasion; that the family would not permit him to eat his meals with them; that they would lock him out of the house when away; that they gave him no money, and did not look after him. Several witnesses, including one of the nephews, testified that they went to the granary to visit appellant in approximately January, 1956, and found the place dirty, cold, and but little food on the premises. Little himself was dirty and clothes filthy; there was human excrement in the bed, on his person, and around the doorway. It appears from the evidence that the testimony of the several witnesses relative to these conditions, referred to this particular period, except the evidence of Mrs. Winifred Smith, a welfare worker, who found somewhat similar conditions on a visit about a year later. Henry Brewster, the nephew, testified that he visited his uncle from one to three times a year; that since Little started living with the Holts, he had visited him about eight times, and had found him in the granary twice — in January, and October of 1956. Following the first time he found appellant in the granary, complaint was made to the Holts, and the old man was taken back into the house. Subsequently, according to appellees' testimony, again at Mr. Little's request, the latter went back to the granary, and stayed there until March, 1957, when he went to the Haws Nursing Home. Appellant's witnesses testified that Little lost a great deal of weight, and became quite feeble after taking up his abode with the Holts. We are a little prone to wonder, as did the Chancellor, why some of those who testified about the conditions in the granary, took no steps to aid appellant,[6] not even to building a fire. Brewster

---

[6] From the Chancellor's oral Opinion: "But the thought that occurs to me is that if a person, a kinsman is found in such a terrible shape, a fellow ought to be able to overcome his inhibitions long enough to at least build a fire for him. Now, that is not to say that Mr. Beaty didn't tell the truth when he testified as to what he found down there. But it just raises that question as to whether the actual suggested deplorable

made an affidavit relating the provisions of the contract, which was recorded at the court house, but this, of course, was for the primary purpose of placing prospective purchasers of the property on notice, rather than bringing to Mr. Little any physical benefit. One could gain the impression that this nephew was possibly more interested in what happened to the property than what happened to his uncle. After one of the friends wrote a letter to the welfare department at Little's request, Mrs. Smith, heretofore referred to, paid a visit. Appellant was declared eligible for welfare payments in May, 1956, and drew checks from that time.[7] Little requested Mrs. Smith, in February, 1957, to help him get into the boarding home (apparently already aware of the existence of this home), and subsequently, was moved there. Mrs. Smith testified she advised him that his welfare check would be increased sufficiently to take care of the additional expense. The testimony reflects that after moving to the Haws boarding home, Mr. Little had a more robust appearance, ate well, kept his room tidy, was able to control his bowels, and went to the bathroom on necessary occasions.

On the other hand, the Holts testified that they took care of him in accordance with the living standard of the other members of the family; that he came to live with them while they still resided in Lincoln, and was taken into the home because none of the other rela-

and terrible condition was quite as bad as Mr. Beaty let on that it was. The Court cannot understand why any person, white or black, finding any other person in a condition like that wouldn't have done something about it, right then and there. And when asked why he didn't try to do something himself to give the old gentleman some relief, Mr. Beaty said that he just couldn't stand the smell, so he just left * * * Now, the same thing is true of Mr. Williams. He seemed to be rather worked up about the fact that the old man didn't have money to pay for his haircuts and shaves, and appeared to be hungry, and dirty and ragged and messed up. But as far as actually doing anything to alleviate the situation, there is nothing Mr. Williams appears to have done. Perhaps he shouldn't have done anything; perhaps there was nothing he could have done. But this sense of outrage which appears on the witness stand seems just a little bit off color when it is squared up with what it seems like a fellow would have done under the circumstances then and there."

[7] He first received $28 per month, then $31, and finally $60, after moving to the Haws home.

tives would have him; that his habits, and failure to control his bowels, contributed to this reluctance by closer relatives. Mrs. Holt testified that she generally cleaned his room and washed his clothes twice a week, and never less than three times every two weeks. She stated that, while living in the house, because of the fact that appellant would dip his hands into the food bowls on the table, he was placed at another table to eat by himself, but received the same food as other members of the family, and in whatever amounts he desired. After obtaining a job, in January, 1957, Mrs. Holt testified that she would prepare his meals before she left. She denied that Mr. Little had been locked out of the house, stating that only the front door was locked. Physical mistreatment of Mr. Little was denied, though she did say that on occasion, the young children would "pick at him," for which she would whip them.[8] Mr. Holt testified that he gave the old man $2 to $5 per week for tobacco and spending money, denied that he had ever physically abused appellant, stated that he was perfectly willing for Little to return and live with them, and that the agreement with the old man would be observed. The evidence reflects that the Holts called a physician to attend appellant on two occasions, it once being necessary to go after the doctor, as the telephone was out of order. Several witnesses living in the vicinity testified that Little had never complained to them about any mistreatment, and there was evidence to substantiate the Holts' contention that Mr. Little went to the granary of his own accord. In short, the testimony in this case was in irreconcilable conflict.

We note that while appellant's witnesses testified as to the weakened condition of Mr. Little, even their testimony reveals that he was able to visit his friends, some 2½ or 3 miles away, once or twice per week. Mr. Little walked this distance, and on several occasions, bought a large sack of groceries in the Summers community, and carried it back home. We also observe the testimony relative to the changes in appellant's attitude

---

[8] The Holts had five children, ranging in age from 7 to 13.

and habits after moving to the Haws home. It is unusual for one to suddenly acquire the habit of tidiness, and to industriously clean his room, where he had not done so before. Likewise unusual is the fact that though unable to control his bowels for several years, this affliction ceased soon after appellant moved to different surroundings. One might well be led to believe, that because he was dissatisfied with the arrangements made, Mr. Little really did not make too much effort to look after himself until leaving the premises. While we consider that the conditions testified about in January, 1956, existed, and were extremely bad, still it must be remembered that Little had already lived with the Holts for close to five years, and there is no evidence, other than appellant's testimony, which indicates any sort of mistreatment during that period. We do not consider the Holts responsible for the application for welfare assistance, since he first applied in 1948, several years before he started living with them; nor does the testimony reflect that the Holts ever received any part of his welfare check. We feel that important evidence as to whether appellees had observed their part of the contract, is shown by the introduction of Little's application to the welfare department for assistance on May 1, 1956. Appellant was interviewed by Mrs. Smith, and she talked with him and filled out his application. Upon completion, she read the application to him, and he signed it. Paragraph B states: ''The source of my (our) support during the past year has been: By Mr. and Mrs. Holt for more than five years.''

The testimony of the various witnesses, contradictory as it is, unquestionably makes this a difficult case to determine. Of course, under such circumstances, the finding of the Chancellor becomes even more persuasive. The trial court apparently listened intently to the testimony of the witnesses, and at the conclusion of the trial, rendered a lengthy oral opinion from the bench. A portion of that opinion indicates that the Chancellor was not too impressed by some of the testimony presented on behalf of appellant. It is true, that when simply read-

ing the evidence from the transcript as to conditions in the granary, one's feelings are momentarily outraged, but when observing a witness from the stand, noting his apparent interest or lack of same in the case, the manner in which he answers questions, such as extreme eagerness or hesitancy, etc., a court can receive an entirely different impression. This, of course, is the reason for the rule, that while we try Chancery cases *de novo,* the findings of the Chancellor will not be disturbed on appeal unless they are clearly against the preponderance of the evidence. After carefully studying the testimony and exhibits in this case, we are unable to say that the findings of the trial court are against the weight of the evidence.

Let it be remembered that the contract provides that the Holts shall take care of Mr. Little for the balance of his life. It is still their obligation, and if Mr. Little returns to their home, it is incumbent that they do so. The termination of this litigation in a manner adverse to appellant's contentions, does not affect any future cause of action based upon a subsequent breach of the agreement. A refusal, or a failure, to properly provide for the old man could well subject the Holts to a suit for damages, based on a breach of contract. It may well be that if appellant has received careless attention in the past, this litigation may serve the useful purpose of providing more careful attention to his needs in the future.

Since this litigation involves title to real estate, the cause is remanded solely for the purpose of entry of a decree, declaring the Summers *bona fide* purchasers and quieting title in them as against the parties herein. In all other respects, the decree is affirmed.

HOLT, McFADDIN and WARD, JJ., dissent.

ED F. McFADDIN, Associate Justice, (Dissenting in part). Insofar as the Summers are concerned, I agree to the affirmance, because Little signed the deed to them. But as between Little and the Holts, I maintain that the decree should be reversed and the cause remanded with

directions to render a judgment in favor of Little and against the Holts for the value of the 107 acre tract as of January 12, 1952, when Little conveyed the same to the Holts.

In 1952 Little owned a farm of 107 acres, was self-sustaining, and not entitled to State Welfare assistance. He conveyed the farm to the Holts in consideration of their promise to take care of him the rest of his life. Now they have denuded him of his property and he is in a nursing home and dependent on State Welfare assistance for his existence. The majority opinion says that Little can go back to live with the Holts if he desires. Back to the corn crib? That is where he was.[1] No. He will stay in the nursing home; the State of Arkansas will pay the bills; and the Holts are the winners.

I maintain that Little should have judgment NOW against the Holts. He could then assign the judgment to the State and something might be salvaged.

Mr. Justice Holt and Mr. Justice Ward join in this dissent.

---

[1] The chancellor in discussing the conditions in the corn crib said: "So, I think we can take it as settled, as far as the testimony is concerned, that the situation described by Mr. Beaty and Mr. Brewster was just about what actually existed there; and it was a pitiable state for any person to be in."